is case number 416-0881, People of the State of Illinois v. Frank Wesley. For the appellant, we have Mr. Gentethis. Is that right? You got it. Okay. And I know that you've been here before. And then for the appellee, we have Mr. McNeil. And we have a motion for leave to cite additional authority that was filed. Do you have a position on that, Mr. McNeil? I actually filed it. I'm sorry. Do you have a position on it? We have no objection. Okay. So we'll show that that motion is allowed, and counsel, you may proceed. Thank you. Thank you, and good morning, Your Honors. I am Michael Gentethis on behalf of the appellant, Frank Wesley. The state failed to prove beyond a reasonable doubt that Frank Wesley committed aggravated battery for two reasons. First, it failed to prove that Wesley acted voluntarily, where traumatic brain injuries left him unable to cognitively control his response to certain highly salient stimuli. Second, the state never proved that the apartment building lobby where this incident occurred was a place of public accommodation where the community was invited to partake in some goods or services. Turning to the first issue, Mr. Wesley's actions were not voluntary. They were an automatic response to stimuli that he could not cognitively control as a result of a traumatic brain injury he suffered in the 1997 car accident. The unrebutted expert testimony below showed that after being in a coma for three months following that accident, Mr. Wesley has severely damaged frontal lobes. Now, these are the areas of the brain that control insight, judgment, reasoning, and most importantly here, self-modulation. He can understand the difference between right and wrong, but what the unrebutted expert testimony showed is that he cannot control his response in the face of certain highly salient stimuli. Counsel, didn't the expert indicate that there are times when he is able to control himself? Not in the face of specific stimuli. It's a matter of what stimulus he is facing. If there are certain stimuli presented, he won't be able to control himself. As Dr. Kirk put it, it's very unlikely he could comport his behavior to his understanding of right and wrong when the right stimulus is presented. And on that point, he had encountered this person multiple times, correct? That's correct. And there were occasions where he did not touch her? No, we don't know the circumstances factually of how close they were in those circumstances. What we do know from those prior interactions, though, is that unfortunately, Ms. Taylor is that type of highly salient stimuli. Did the expert indicate that? Indicate what? That she's that type of stimuli. Based on her testimony and the at least five or so interactions that they've had previously, it shows that this is the sort of stimuli that he is going to react to consistently. And if he is able to get close enough to do this kind of touching, that's what will result. Did the expert indicate that? The expert... Was there any analysis of whether or not this particular person and what she was doing or the nature of the interaction was the type of stimuli that would automatically deprive him of his ability to, you know, voluntarily control his actions? The expert wasn't able to define the category of what highly salient stimuli would trigger that response, but she could opine that he simply lacks the, as she put it, the go, no-go equipment to modulate his behavior when that kind of stimuli is presented. And based upon the evidence that was shown to the jury, there is a history here, as you pointed out, between Ms. Taylor and Mr. Wesley, that shows when she is presented to him, he is unable to modulate his behavior. In those scenarios, he's not, as the state put it in their closing argument, he's not the kid reaching for the cookie jar. He's more like the compulsive eater who cannot stop no matter what the repercussions are or the severely handicapped individual who grabs a red-hot iron even though they know it's going to cause severe damage. I still don't understand your response to Justice Holder-White's question or what the jury was to do with the evidence here where on multiple occasions he had encountered the victim and not touched her. Why should the jury accept your, the defendant's theory that he was incapable on this occasion from being able to control himself? It seems that there, not only is there a gap, in other words, the expert did not testify that on this occasion the defendant was incapable of controlling his actions. It seems that there was a pattern prior to this of him interacting with the victim and not touching her. Again, the prior interactions aren't a matter of record here as to how close they were, what the circumstances were that might have allowed him to physically contact Ms. Taylor in those prior cases. We just can't say whether he would have been able to in those prior interactions. But what those interactions suggest is that she is at least the kind of stimulus that triggers this automatic response. Again, that's not something under his cognitive control. It's not within his capability following the damage done in 1997 to control cognitively, even if he knows this is right or wrong, how he responds in the face of that stimulus. Counselor, I just, I take, I'm just not so sure I'm buying what you're saying. You're saying she is the type of stimuli. We don't know that, do we? Based on the record here, the state failed to prove. What about the record here? The testimony from Ms. Taylor that establishes a history between these two. It shows that each time he's presented with that particular stimulus, he's going to interact with her in some way at least. We don't know exactly what the factual scenarios are in the prior interactions that they've had, but it's enough to suggest that while maybe he wouldn't respond, as the state pointed out to Dr. Kurth herself or to other members of the court, his response to her, to Ms. Taylor, is always going to be a strong one. This is a highly salient stimuli for him, and whether he is close enough to make physical contact with her in those prior incidents, his reaction in this case, in this particular time, isn't voluntary. The state can't show beyond a reasonable doubt that he's able to cognitively control that response because of the high salience of this particular incident. So based on what the jury heard, could they have determined that it's not that she's this type of stimuli that he can control himself, but couldn't they just conclude simply that he finds her attractive or he wants to interact with her and he just simply chose not to behave himself? Not beyond a reasonable doubt. At this stage, the unrebutted expert testimony shows he just lacks the cognitive equipment to decide, to modulate, whether or not he's going to interact with her and potentially touch her. Given their history, it's clear she is the kind of stimulus that engages that response for him, and that is not a cognitively controlled action. It's not an external manifestation of his will. It is simply not a voluntary act. Counsel, how do we, I'm sorry, how do we deal, and I'm going to go back to where Justice Holder White began with this conversation and these questions, and that is, with regard to Dr. Kerr, what do we do with this statement on cross-examination that the doctor, after testifying, acknowledged that there are times when the defendant can control his behavior, even after being stimulated? There are times where he can control his behavior in response to non-highly salient stimuli. It's all a matter of what that category is. Now, the doctor wasn't able to opine on what fits within that category. The evidence is strong to demonstrate that Ms. Taylor, at least, falls within, and unfortunately, every time he's presented with that stimulus, he's going to respond strongly, and if he's, as it was on the day of this incident, able to reach her, he might touch her. Now, that's not something, again, that shows his cognitive control over those actions. That kind of complex coordinated movement can be involuntary, as this Court has found in the past. With that line of argument, can we also consider the fact that there had been these prior occasions when, in finding this particular person to be someone who highly stimulates him, he didn't have contact? Perhaps there were incidents where there were conversations and things said, maybe inappropriate, maybe not, but there was no contact. Can't the jury take that into consideration? Well, because those incidents aren't in front of the jury, we don't have all of the factual background on those, and the State needs to prove, beyond a reasonable doubt, that his actions here are voluntary. There just isn't enough proof to suggest that this kind of stimulus response behavior is something he can cognitively control, or something he has the volition to control or prevent his conduct. The jury is privileged to either accept or reject expert testimony in any given case, true? Yes. Even if you had testimony from Dr. Kurth, which you don't have here, that at all times the defendant was unable to control his actions, and this particular situation involved a stimulus that he was never confronted with previously, do you agree that was not Dr. Kurth's testimony here? So, even if you have that testimony here, the jury was still free to reject Dr. Kurth's expert testimony. Well, certainly, but Dr. Kurth's testimony doesn't suggest this was a first-time response, a particular stimuli he hadn't seen before. It's more akin to Pavlov's dogs being trained with a particular stimulus to respond in a particular way. So every time that bell rings, we know that Ms. Taylor presents that kind of stimulus that he's going to respond to quite strongly. And I accept that it can be a persuasive argument, and certainly the jury could have found Dr. Kurth's testimony to be very credible and persuasive, and found the defendant not guilty. But that's not what it did here. It chose not to accept Dr. Kurth's theory, or to determine that the defendant was incapable of controlling his actions here, true? In light of Dr. Kurth's testimony, and the evidence presented in Ms. Taylor's testimony as well, a reasonable juror could not have found, beyond a reasonable doubt, that Mr. Wesley was able to voluntarily control his response in light of this particular stimulus. Can't a jury say, you know, okay, we've heard this expert opinion, we just don't accept it. It flies in the face of common sense. Any number of reasons why a jury can reject expert testimony, true? True, but again, the evidence here did not provide the reasonable juror the opportunity to find, beyond a reasonable doubt, that Mr. Wesley's actions were within his cognitive control. This was an external manifestation of his will, such that he should be convicted of aggravated battery for his actions that day. But this is a sufficiency of the evidence question, so you're acknowledging potentially that the evidence could be sufficient, such that the jury could make the finding that it made. It's a possibility. The standard is that a reasonable juror can find, beyond a reasonable doubt, that Mr. Wesley acted voluntarily. And we have to view the evidence in the light most favorable to the State, and if there is a reasonable inference to be drawn that supports the jury's verdict, then we don't reverse, correct? With these facts, no reasonable juror could find, beyond a reasonable doubt, again, that Mr. Wesley acted voluntarily under this scenario. Turning to my second point, the State entirely fails to prove that this apartment building lobby was a place of public accommodation. The evidence shows that the area that Ms. Taylor entered was separate from the retail stores on the first floor of this building, the McDonald's, the Panda Express, that have bright lights inviting customers inside to partake in some goods or services. Taylor entered the double doors of the building to unlock a wall of mailboxes, down the hall from an elevator to private residences, and with an emergency exit in the back. There is nothing attractive or interesting to the general population in that apartment building lobby. As a matter of statutory interpretation, plain language of this Aggravated Data Race statute is clear. A place of public accommodation is, as this Court has held, a place the public is invited to come in and partake of whatever is being offered inside. There is simply nothing being offered to the public behind these doors in the apartment building lobby. Was there any kind of diagram or map showing the layout of where this occurred? No, Your Honor. The only evidence we have is Ms. Taylor's testimony, that she walked through unlocked double doors into a lobby. So we don't know what was where. I mean, we know where the mailboxes were located. We know where she walked in, but do we know the proximity of the retail shops? Is it possible that she was in the area of the retail shops? It's not possible that she was in the area of retail shops when she was touched. She testified there were only two doors, a double door she walked through and an exit in the back. The State doesn't prove any other interaction with those retail locations on the first floor and the apartment building lobby where she was. And it's their burden to show, again, beyond a reasonable doubt, that this is a place of public accommodation, a place the community is invited inside to partake in some kind of goods or services being offered. Do we know if there was access to the retail shops in that location where she was? Access directly from the lobby to the retails? Again, no. There's no evidence. We don't know either way? There's no evidence to suggest that there is. And it's the State's burden to show this element of the offense beyond a reasonable doubt that this was a place of public accommodation. Now, what about the fact that she could just walk in during the day or whatever the hours were that this location was just open, anyone could just walk in? Again, if the legislature wanted to define this offense more openly and just to suggest that any place open or accessible to the public triggers the felony version of battery, they could have, but instead they limited it to a place of public accommodation. That's a much more limited category. That's an area where individuals are being invited inside to partake in something. Ms. Taylor did testify that these double doors were not locked during business hours. And she used the term business hours or that those words were used in framing of the question. But accepting that business hours would contemplate a business and if these doors were not locked during business hours, couldn't the jury infer that this was a place of public accommodation? Just having unlocked doors during the hours of 9 to 5 does not establish business hours. No one said anything about 9 to 5, just business hours. That connotes a place of business where business is transacted, not a private area, but something that's available to the public. Well, Ms. Taylor's testimony does not establish that this lobby is conducting any sort of business. That the doors are unlocked in those hours as a matter of convenience to the residents and to delivery persons like Ms. Taylor doesn't establish that there is a general offer being made to members of the community. Hey, come inside. We have something that we'd like to draw you in for. This isn't akin to a parking lot, to a hotel or a convenience store, which this Court has addressed in the past, where the owners are hoping that individual members of the community will come and congregate and hopefully come inside and buy some goods or services. There's nothing on offer here. There's nothing attractive inside to the general public that would make this a place of public accommodation. Counsel, it almost seems unfair to continue to ask questions about things that aren't on record. What if we have unlocked doors, we have business hours, we've got several residences and mailboxes, what if there is a mail slot to put mail into? Again, not something that's in the record, but the mail slot would not alter the public accommodation aspect of this building. Because you're not inviting... If you have unlocked doors within a lobby where there's business hours and anyone can drop mail there, that wouldn't change. And I know this is almost unfair to ask these questions, but I'm just curious as to what your take on this would be. Because that's not something that's inviting the general public in for an attractive offer, some sort of goods or services. Now, I would grant the point that if, say, there was an advertisement for apartments to rent, come inquire inside. Maybe at that point you're advertising something to the general public. But I think neither of those factual details are demonstrated at all on the record that we have. And to prove beyond a reasonable doubt that this location is a place of public accommodation, more than what the state demonstrated was necessary. Are there no further questions? I don't see much this time. We ask this Court to reverse Mr. Wesley's aggravated battery conviction. Thank you, Counsel. Mr. O'Neill. May it please the Court, Counsel. As for the public place thing, I just wanted to state that the definition does not have anything to do with whether the public is attracted to a place or any products to sell or anything, any terms of business like that. The cases I cited in my brief, Murphy Ward and this Court's in Lee, all state that the common thread between the definitions of public place of accommodation is accessibility by the public. This Court in Lee also stated that the purpose for this aggravating factor, the public place aggravating factor, was that a battery done in public is obviously more of a threat to the community as a whole. And the legislature did not intend for this language to be narrowly interpreted. In other words, we're looking at a liberal construction of the definition of public place of accommodation. If you read the statute 12-3.05c, a person commits aggravated battery when in committing battery, he or she is, or the person battered is, on or about a public way, public property, a public place of accommodation or amusement, a sports venue or a domestic violence shelter. Public way, public property, these are big, these are wide definitions. It's obvious that the legislature did not intend for this to be a niche aggravating factor. Anything that's accessible to the public satisfies the definition to public place of accommodation, as this Court stated in Lee. Looking at the evidence in the light most favorable to the prosecution as here, the evidence showed that this was clearly a public building. The doors were unlocked. There's nothing to suggest there was a doorman or a buzzer or a key card needed to access this lobby. This was a building that was the size of a city block. There were several restaurants and apartments in the building. We do not know the proximity to the lobby or whether there were entrances to these businesses from the lobby. All we know, all Taylor testified to was that there were two exits. What if it was purely residential? It's an apartment building and it has a lobby? Has a lock. And that's where this happens. Has a lock. Lobby. I'm sorry? Oh, a lobby. I thought you said, does it have a lock? If it has a lobby and it's accessible to the public, I would say that under the liberal definition of public place of accommodation, this would... You come back to this accessible to the public language, and to me that's just as problematic as a public place of accommodation because it still doesn't get you to a really usable definition. What is accessible to the public in that context? I mean, is it someplace where an individual could not be guilty of trespass? How do you define this concept? Again, it's not to be narrowly interpreted. I would say that any place where the public is necessary, if there was maybe a sign or a doorman or something that influenced negatively the public from wanting to come in or something like that, there may be a better argument in this case. But here, all we know is that there were double doors. It wasn't a single door or anything like that. And there was also another exit on the other side of the building and that these doors were unlocked. And that Taylor and the defendant had no problem going into the building. No one stopped them. There was nothing that said that the public was not allowed in the building. Nothing suggests that. I would say that the evidence here, there could be a hotel lobby or an apartment lobby that there may be an argument that it's not a public place of accommodation. But the evidence here, this one's not it. I won't speak for my colleagues. I find this aspect of the case a little more difficult than the other issue in terms of the voluntariness. With this one, for one, it seems the State needlessly glossed over an element of the offense that it could have presented testimony or evidence on and cleared this up. Based on this record, it was proven, arguably, strictly by inference, given where Ms. Taylor described each of the physical elements of the building that relates to the sidewalk and so forth. But this public accessibility, I still have trouble here defining in my mind what constitutes the dividing line between that which is a public place of accommodation and that which is not. So far, based on the briefs and what I've read, you start getting into a real gray area here. There are the cases involving the parking lots that are adjacent to a private establishment, and those have been found to be public places of accommodation. You're getting into a lobby now and maybe even a common area now within a condominium complex or a townhouse. The door might be open, but is that the equivalent of saying that's accessible to the public? I would say it is. It's, again, a liberal construction of this definition, and nothing in this case suggests the opposite. If the door to my garage might be open, does that make it a public place of accommodation? No, because your garage is not a city block big with public businesses inside of it. The main point that Lee stated, the decisive factor is accessibility to the public. And here, especially when looking at the evidence in the light most favorable to the state, the state proved or at least allowed a reasonable inference that this was a place accessible to the public, and that satisfied the definition in 12-3.05C. If there are no more questions on the public place issue, I will talk briefly about the voluntariness. Is voluntariness a word? I don't know. As for both issues, again, we have to remember that the high standard of review, that being when looking at the evidence in the light most favorable to the prosecution, whether any rational trier of fact could find a defendant guilty beyond a reasonable doubt. Now, Mr. McNeil, you cited the Sandy case in your motion to cite additional authority, and it deals with the death of a child and the issue of whether or not an instruction should have been given with respect to the definition of knowingly. How does that impact here where we're talking about voluntariness? I only cited Sandy because I think of hypotheticals that your honors may ask me during oral argument, and one I thought of was, as Justice Harris actually already questioned, posing counsel on, what if Dr. Kurtz's testimony was as conclusive as the defendant says it is? People versus Sandy, this Court established that a jury assesses the credibility of all witnesses, including expert witnesses, and they're free to disregard an expert's opinion and disregard an expert's conclusion if they so choose. And you're right. It does specifically refer to the fact that the jury can disregard the testimony of the expert, and that certainly came up. I don't think it applies in this case, as Justice Harris noted, because Dr. Kurtz's testimony, I would submit, was just as beneficial to the State as it was to the defendant. If we want to contrast between this case and Nelson, which is the main case the defendant relies upon, there are multiple distinguishing factors. The first is that the opinion in Nelson from the expert that this defendant had Tourette's Syndrome and this Tourette's Syndrome was solely responsible for him picking up the phone and making lewd phone calls, an involuntary tick, she called it. That is conclusive and uncontroverted testimony. Here, Dr. Kurtz's testimony was anything but conclusive and uncontroverted. She made many concessions and admissions on cross-examination. The defendant could choose right from wrong in certain situations. That defendant could control his poor impulses when social barriers were in place. At that point, the jury is free to reasonably infer that the defendant could choose right from wrong in the situation when he touched the victim here. In other words, this was a voluntary and knowing aggravated battery. The focus on example in Kurtz's cross-examination was her very interview with the defendant. In that interview, she admitted that the defendant didn't touch her, but there were authority figures in the room. Clearly, the defendant can behave himself in certain situations when he knows there's going to be consequences, like he did in the interview with Dr. Kurtz and like he did apparently at this trial. There's nothing in the record that suggests he had any outbursts or touched anyone improperly during this trial. That moves to the second part of Nelson. The fact finder there, like here, had the benefit of observing the defendant throughout the whole proceedings. In Nelson, even during the expert's testimony, the defendant kept repeatedly making outbursts in the courtroom. The jury saw that. The jury could take that into consideration. Just like here, the jury observed the defendant throughout the proceedings, observed his good behavior apparently. There's nothing to suggest that he had any outbursts or any involuntary muscle spasms or anything like that. And they observed him during his own testimony. He testified in this case. Clearly, the jury can take that. I mean, we give them a great standard of great deference on review because they're in the best position to evaluate the credibility, the demeanor, and the behavior of all the witnesses and everyone in the courtroom. They observed the defendant here. Even if Kurth's opinion was that this specific case was a case of involuntary touching, the jury was not bound by that decision. They could observe the defendant, look at all the other evidence, and say, no, we think the defendant has sufficient control over his bodily functions and that this aggravated battery was done voluntarily and knowingly. And again, I don't think Sandy applies in this case. It was just a hypothetical which was brought up during opposing counsel's argument. But even if Dr. Kurth's testimony was as conclusive as defendant wishes it was, the jury is still not obligated to take it as gospel. If there are no more questions. I have another question. So it's your position that this happened in a place of public accommodation? Yes, according to the liberal construction of the definition. Not a public way or public property? No, the way it was charged was public place of accommodation. And I would argue that I quoted the context of the whole statute to show that all of public property is one category in the statute. This is not meant to be taken narrowly. If it's in the public, if it's in a publicly accessible place, the threat of the community being harmed is obviously greater. And that is why this aggravating factor is in place. Thank you. Thank you. Any rebuttal, Mr. DeTetris? No. Your Honors, in People v. Murphy, this court defined a place of public accommodation as a place where the public is invited to come in and partake of whatever is being offered therein. That is not the same as bringing all private encounters into the public sphere. It's a rule, as my opposing counsel noted, that's designed to protect threats to the public's safety, to the community at large, not to turn any misdemeanor battery into a felony. The State's definition doesn't make this a niche. It makes it an invitation to turn all such encounters into felonies. And as Justice Harris pointed out, the unlocked garage or the accessible front porch that was at issue in Dexter, these are not places of public accommodation. But this building housed restaurants, right? Absolutely. Okay. So doesn't that then arguably allow the jury to infer that the doors off of the sidewalk, the street entrance there would allow someone to go to these restaurants? No, not on this testimony. The testimony from Ms. Taylor is clear. She entered double doors, and there was only one other door to that apartment building lobby. There's no evidence at all that the restaurants or other services on that first floor had access to that area. That lobby is not a place of public accommodation where members of the public are invited in to partake in something. As opposing counsel suggested, the language here is place of public accommodation, not any place open or accessible to the public. If that was the definition, then it very well could be that a front porch or an unlocked garage amounts to a place of public accommodation. But as this Court has noted, something needs to be on offer. Something needs to be attracting members of the public to trigger this felony version of battery or else every interaction potentially becomes that sort of felony. Turning quickly to the first issue, I'll just note that Mr. Wesley's failure to attempt to touch Dr. Kurth or other members of the Court just shows that they were not the equivalent of Pavlov's L for him. They were a horn honking in the background that did not trigger the kind of automatic stimulus response. And a defendant in Nelson who had this complex Tourette's tick that involved finding a phone number, picking up that phone, dialing it, and then speaking to an individual on the other side, sure, he didn't make any phone calls during the course of that trial. But the unrebutted expert testimony in that incident showed that his actions were involuntary just as Mr. Wesley's actions were here. If there are no further questions, I ask that you reverse Mr. Wesley's conviction. Thank you, Counsel. We'll take this matter under advisement and be in recess until the next case.